Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

_Eastern_____ Division

| | |
|---|---|
| Aimee Kingston | Case No. _____ |
| | *(to be filled in by the Clerk's Office)* |
| _____ | |
| *Plaintiff(s)* | Jury Trial: *(check one)* ☑Yes ☐No |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |
| -v- | |
| See Attached | |
| _____ | |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)* | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Non-Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Aimee Kingston |
| Address | 550 Liberty Street #504 |
| | Braintree    MA    02184 |
| | *City*    *State*    *Zip Code* |
| County | Norfolk County |
| Telephone Number | 508-202-8252 |
| E-Mail Address | akingston111@gmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | SEE ATTACHED |
| Job or Title *(if known)* | |
| Address | |
| | *City*    *State*    *Zip Code* |
| County | |
| Telephone Number | |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☐ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Address | |
| | *City*    *State*    *Zip Code* |
| County | |
| Telephone Number | |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☐ Official capacity

Defendant No. 3
>   Name
>   Job or Title *(if known)*
>   Address

|  | City | State | Zip Code |
|---|---|---|---|

>   County
>   Telephone Number
>   E-Mail Address *(if known)*

☐ Individual capacity     ☐ Official capacity

Defendant No. 4
>   Name
>   Job or Title *(if known)*
>   Address

|  | City | State | Zip Code |
|---|---|---|---|

>   County
>   Telephone Number
>   E-Mail Address *(if known)*

☐ Individual capacity     ☐ Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☑ State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

This action seeks money damages because of a participation in wrongful deprivation of Plaintiff's life, liberty and property. Plaintiff alleges that all of the Defendants acted under the color of the state law and violated Plaintiff's rights under the First, Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

n/a

D.      Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.
        SEE ATTACHED

## III.     Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.      Where did the events giving rise to your claim(s) occur?
        SEE ATTACHED

B.      What date and approximate time did the events giving rise to your claim(s) occur?
        SEE ATTACHED

C.      What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*
        SEE ATTACHED

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

## V.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

Plaintiff Claims Compensatory and Punitive Damages:

 SEE ATTACHED.

## VI.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          08/05/2024

Signature of Plaintiff

Printed Name of Plaintiff     Aimee Kingston

### B.     For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

|  | *City* | *State* | *Zip Code* |
|---|---|---|---|

Telephone Number

E-mail Address

# COMPLAINT

**Plaintiff**

Aimée Kingston
550 Liberty Street #504
Braintree MA 02184
**Vs.**

**Defendants (18)**

*( Includes the following Individuals)*

Gregory Strange
Former Chair Town of Easton Planning and Zoning Board and
former Member Town of Easton Historical Commission
201 Poquanticut Avenue
North Easton MA 02356
Bristol County

Frank Caridi
Town of Easton Local Building Inspector
30 Noreen Road
Mansfield MA
Bristol County 02048
Phone (508)230-0584
fcaridi@easton.ma.us

Stephanie Danielson
Town of Easton Director, Planning & Economic Development
603 Summer Street
Brockton MA 02302
(508) 230-0641
sdanielson@easton.ma.us

Kevin Greiner
Town of Easton Building Commissioner and Zoning Enforcement Officer
8 Washington Street
Easton  MA 02356
Phone (508)230-0583
kgreiner@easton.ma.us

Connor Read
Town of Easton Town Administrator
69 Kennedy Circle
South Easton MA 02375
508-230-0510
cread@easton.ma.us

Dottie Fulginiti
Chair Easton Select Board
78 Elm Street
North Easton MA 02356
dfulginiti@easton.ma.us
508-272-8105

Peter Deschenes
Former Vice Chair for the Town of Easton Planning and Zoning Board
236 Depot Street
 South Easton MA 02375
Bristol County

Robert Stetson
Former Member and Current Chair of the Town of Easton Planning and Zoning Board
48 Pond Street
North Easton MA 02356
Bristol County

Christopher Anderson
Former Member of the Town of Easton Planning and Zoning Board
207 Poquanticut Avenue
 North Easton MA 02356
Bristol County

Deborah Balcarek
Former Member of the Town of Easton Planning and Zoning Board
32 Lyman Wheelock Rd
Easton MA 02375
Bristol County

Amos Keddem
Former Member of the Town of Easton Planning and Zoning Board
20 Black Brook Road
Easton MA 02375
Bristol County

*( Includes the following Government Entities)*
The Town of Easton Massachusetts
136 Elm Street
Easton MA 02356
Bristol County

The Town of Easton Massachusetts Inspectional Services
136 Elm Street
Easton MA 02356

(508)230-0581
Bristol County

<u>The Town of Easton Massachusetts Building Department</u>
136 Elm Street
Easton MA 02356
(508)230-0581
Bristol County

<u>The Town of Easton Massachusetts Planning and Zoning Boad</u>
136 Elm Street
Easton MA 02356
508-230-0630
Bristol County

<u>The Town of Easton Massachusetts Planning & Economic Development</u>
136 Elm Street
Easton MA 02356
Bristol County

<u>The Town Easton Massachusetts Department of Town Administrator</u>
136 Elm Street
Easton MA 02356
(508)230-0510
Bristol County

<u>The Town of Easton Massachusetts Select Board</u>
136 Elm Street
Easton MA 02356
Bristol County
(508) 230-0501
selectboard@easton.ma.us

# COMPLAINT

1. This action seeks money damages because of a participation in wrongful deprivation of Plaintiff's life, liberty and property.  Plaintiff alleges that all of the Defendants acted under the color of the state law and violated Plaintiff's rights under the First, Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States.

# JURISDICTION

2. Venue in the United States District Court for the Massachusetts Eastern Division is proper pursuant to 28 U.S.C. §1331.

## ALLEGATIONS

3.  On or About March 7,2022 A Special Permit was approved by the Town of Easton Planning and Zoning Board ("Planning Board") to modify the existing structure located at 35-37 Poquanticut Ave, Easton, Massachusetts ("The Property") originally built in 1830.  The Property needed a special permit due to the current and proposed future use as a duplex is only allowed via special permit.  The prior special permit expired as the property was vacant for three years after US Bank acquired the property via foreclosure. The new special permit issued on this day approved both the continued use as a duplex, as well as modifications necessary to accommodate a dormer addition off the back of the existing structure. (incl with EXHIBIT A).

4.  On or About June 30, 2022 Frank Caridi ("Caridi"), Local Building Inspector for the Town of Easton,  issued a Building Permit for construction to modify the existing structure at the Property. Michael Castillo ("Castillo") , Licensed Builder and General Contractor hired by the Plaintiff, applied for the permit including both the architectural drawings and structural engineers drawings. Both sets of drawings clearly illustrated the intent to re-frame the roof to accept the dormer addition that was approved in the Special Permit.  The Drawings further illustrated the intent to fully renovate the existing two units.(See EXHIBIT B)

    i.  It is important to note that part of the review process for Building Permits includes a review of all aspects of the property including zoning. Caridi, by issuing the Building Permit, was effectively in agreement that the plans were in alignment with the special permit. The Building Inspector cannot issue a permit without this review.

5.  On or about August 30, 2022, Defendant Greg Strange ("Strange"), who was the chair of the Planning Board at the time, phoned the Department of Inspectional Services to report a suspected violation. This was stipulated by Strange during the Planning Board meeting on September 7,2022. (See EXHIBIT C)

6.  On or about August 30, 2022, Caridi phoned Castillo, to inform Castillo verbally that an immediate stop work order was being authorized and that Castillo must immediately cease and desist all activities on site due to a violation per 780CMR R114.1.  Caridi informed Castillo that the violation wasn't coming from him and further noted that Caridi had no authority to resolve the matter. The Plaintiff called the Building Department and Suzanne Niego-Levy, ("Niego-Levy"), the Planning/Zoning Clerk at the Town of Easton, in an attempt to understand the violation and get a copy of the violation emailed.  Niego-Levy informed the Plaintiff that a copy had not yet been uploaded to the system and she was unable to send via email.

    i.  Caridi is responsible for issuing violations of 780CMR with abatement orders (See EXHIBIT D) which directs the contractor or property owner on how to immediately remedy the violation. No other authority has jurisdiction for issuing or enforcing the Building Code. As of the writing of this demand letter, the Plaintiff is not in receipt of a written abatement order from any individual or government entity.  These actions/inactions deprived the Plaintiff of her Constitutional rights.

7.  On or About September 6,2022 The Plaintiff phoned the Town Of Easton and spoke to Niego-Levy, whom advised her to contact Stephanie Danielson ("Danielson") to get on the public agenda to discuss the violation.  The Plaintiff informed Niego-Levy that she was not yet in receipt of the violation and therefore was not prepared to discuss what

was not yet understood. The Plaintiff advised Niego-Levy that she would need some time after receiving the written violation to understand the allegations before requesting to be put on the agenda and would subsequently reach out to Danielson at that time.

8. Also On or About September 6,2022 The Plaintiff received a written copy of the violation which stated a violation of 780CMR R114.1. 780CMRR 114 is titled VIOLATIONS: unlawful acts against 780CMR. The text of the violation said that the structural demolition work completed is not in accordance with the special permit issued on March 7, 2022. There was no abatement/remedy order included as required by the code. The Special Permit is a Zoning Permit. (See EXHIBIT D).

   i. The special permit issued (Incl EXHIBIT A) by the Planning Board did not address or put limits on structural work that may or may not be required to complete the approved dormer addition. An industry knowledgeable person would recognize that modifications of the roof framing would be required to install a dormer on a structure built in 1830 in order to meet today's building code.

   ii. Structural Drawings are not a requirement to submit for Special Permit Application.

   iii. Structural Drawings were included in the Building Permit application package.

   iv. Since the Building Department completes a zoning review before issuing any Building Permit, Caridi clearly agreed that the proposed structural upgrades were within the scope of the special zoning permit as he issued a Building Permit for the work. Furthermore, at no time up to an including the date of this complaint, has Caridi suspended or withdrawn the building permit he issued.

   v. Caridi claimed, in subsequent follow-up, that the Abatement order was to find resolution with the Planning Board. Both Building and Zoning codes require abatement orders to be provided in writing on the violation. (See XHIBIT D) In the case of zoning violation this would only be determined after an investigation as mandated by MGL and Easton Town by Laws. The Plaintiff is not in receipt of the investigatory documents from any Government Entity. These glaring deficits in the documentation deprived the Plaintiff of her Constitutional rights of the United States.

   vi. The Stop Work Order referenced Section R114.1 – which is unlawful acts against 780CMR – the Building Code. Caridi is not authorized to issue zoning violations as only the Zoning Enforcement Officer is permitted such authority. (See EXHIBIT D) Caridi's insistence that suspected violations of a Special Permit are governed under the Building Code is simply not true. Caridi's written violation clearly illustrates his belief that Zoning violations are under his purview and under the purview of the Building Code. These are fraudulent and negligent misrepresentations. Caridi Issued a Building Code Violation for unlawful acts for work that Caridi himself approved for construction when he approved the building permit. How can it be unlawful to build what Caridi himself permitted. These glaring deficits in process deprived the Plaintiff of her Constitutional rights of the United States.

   vii. Caridi additionally exhibited a flagrant disregard for the Zoning Violation Process as set forth in both Massachusetts General Laws ("MGL") and

adopted by Town of Easton by Laws (See EXHIBIT D). This omission is a deprivation the Plaintiffs Constitutional Rights of the Constitution of the United States. Kevin Greiner ("Greiner") is the Zoning Enforcement Officer for the Town of Eaton.

viii.  Caridi demonstrated deliberate indifference to the Plaintiff and her Representative(s) when questioned about the true intent of the violation; and when the conflicting nature of the written statements in the violation were questioned, Caridi abruptly ended the conversation. The deliberate deficiencies and conflicts in the violation made it impossible for the Plaintiff to remedy. These glaring deficits in the documentation and due process deprived the Plaintiff of her Constitutional rights of the United States.

ix.  The Defendants consistently refer to the formal order as a Stop Work Order which is section R115 (see EXHIBIT D). Section R115 is not identified on the written order. Section R114 is a violation of any Permit issued pursuant to 780CMR. Section R115 is a violation of work regulated by 780CMR. Both sections require the specific activity/code to be cited that informed the Written Order and the immediate remedy must also be stated on the written order. Going forward the use of the words "Violation" and "Stop Work Order" are used interchangeably and shall all refer to the same document.

9.  On or About September 7,2022 The Plaintiff received an email from Niego-Levy informing her that the topic of the violation at the Property was placed on the agenda for the Town of Easton Planning and Zoning Board for the evening of September 7, 2022. Niego-Levy would not respond to phone calls made following receipt of this notification. (See EXHIBIT C)

10.  Also On September 7,2022 The Planning Board raised the question of the violation at the regular Planning Board Meeting. (See EXHIBIT C) Strange stated that he was both the member of the public who witnessed and reported the perceived violation, and also the person who wielded his influence to compel the Town of Easton Inspectional Services to issue an immediate violation order. Strange went on to editorialize his version of events in a grandstanding manner and when the Plaintiff requested to join the remotely held meeting, Strange seemed shocked the Plaintiff was in attendance and told the Plaintiff he was "not ready to speak with her". Danielson was running the meeting and admitted the Plaintiff to the meeting. The Plaintiff attempted to clarify the misstatements and misrepresentations all the while Strange would constantly interrupt, berate, belittle and speak over the Plaintiff often stating opinions as facts. Strange condemned The Plaintiff over additional demolition that he felt was not authorized under the special permit; going on to say that he has witnessed the Plaintiffs presentation to the Historic Commission where the Plaintiff promised to 'Preserve' the building. Strange further noted that the drawings submitted for special permit said 'Preserve' throughout, and in his opinion that is not what was being completed. Strange presented himself as both the judge and the jury and no member of the Planning Board attempted to intervene in Stranges' inappropriate tyrannical behavior. The Plaintiff attempted to offer that some existing framing members were discovered to be rotted during the course of the permitted framing work - and the extents of which were greater than expected. This is a common occurrence during renovations of older buildings. The Plaintiff further attempted to point out that a presentation was not completed to the Historic Commission as it was not a requirement (See EXHIBIT E )(See EXHIBIT A). - But ultimately Strange spoke louder to

drown out the Plaintiff for much of the meeting and no constructive dialogue was accomplished. The Plaintiff offered Strange and the Planning Board Members photos of the discovered rot (See EXHIBIT F) as well as a site visit to witness the rotted members. Strange angrily refused both. Danielson, along with all the Planning Board members present, failed to intervene and request copies of proffered documents and photos and/or agree to a site visit. The Plaintiff further noted that the structural engineer Pavel Kozhokin, {"Kozhokin") of Berdi Consulting was aware of the deficiencies, though a final reconstruction plan had not been issued yet as the conditions were just being revealed. (See EXHIBIT F).   Strange, Danielson and all members of the Planning Board summarily refused to see photos, review any of Kozhokin's documentation and refused a site visit to witness conditions themselves. Instead, all defendants relied solely on Strange's editorialized version of events and determined physical evidence and proof was not needed or necessary. The Plaintiff apologized for not understanding what procedure should have been followed when existing rotten members were discovered. The Plaintiff attempted to notify Strange and the Planning Board that Castillo informed both Caridi and Kozhokin when existing members were found in need of repair or replacement. (See EXHIBIT F) The Plaintiff went on to ask what resolution process was in place that should be followed moving forward. Strange stated that a violation as egregious as this had never happened and there was no process in existence to handle violations of this magnitude. Strange went on to advise that the next step would be to contact Stephanie Danielson to schedule an offline meeting.

    i. Strange demonstrated fraudulent and negligent misrepresentation and a deprivation of the Plaintiffs Constitutional rights when declaring that there was no process for such an egregious violation. The Building Code and Zoning Code both have clear processes for violations. Neither of which was followed by any of the named Defendants. The deliberately evasive manner wherein the violation was issued made it impossible for the Plaintiff to establish a clear path to resolution. The Plaintiff was constantly re-directed as to what the violation was for and so it was impossible to insist on a specific process to be followed. The Plaintiff was deprived of her Constitutional Rights of the United States and subjected to impulsive misdirections and redirections in an attempt to find resolution. It is noteworthy that nowhere in MGL or Easton bylaws are private meetings with two representations (empowered by others or not) recognized as an appropriate action in any dispute resolution.

    ii. Strange and Danielson deprived the Plaintiff of her Constitutional Rights by putting the subject of the violation on the agenda against the Plaintiffs wishes, then Verbally assaulting and humiliating the Plaintiff in a Public forum, and subsequently refusing to see the documentation needed for resolution. (see EXHIBIT's C and F). This was deprivation of the Plaintiff's Constitutional rights of the United States.

    iii. Strange demonstrated fraudulent and negligent misrepresentation and a deprivation of the Plaintiffs Constitutional rights when making endless false statements to the Board and the Public Community of Easton, including but not limited to the statements that Strange had witnessed the Plaintiffs presentation to the Historic Commission. The video of Historic Commission ("Commission") meeting on January 4, 2022 (See EXHIBIT E) shows all

members of the Commission politely reminding Strange, who was a member of the Commission at that time, that the Commission had no authority over the project. There was no presentation ever made, as it was not a requirement. Moreover, Strange's role on the Planning Board is to incorporate formal input from various departments and Boards. The allegations made by Strange - irrespective of their factual accuracy, were not actually brought forth formally by the Commission, nor addressed in any Planning Board meeting leading to the issuance of the permit.

iv. Strange demonstrated fraudulent and negligent misrepresentation and a deprivation of the Plaintiffs Constitutional rights when making endless false statements to the Board and the Public Community of Easton about the word PRESERVE. The word PRESERVE does not appear in the documentation in the frequency or manner alleged by Strange in his tyrannical speech. The word 'preserve' means to keep from harm or injury, to protect from decaying, dissolution and decomposition. Although preserve can also mean to keep intact, it is clear that portions of the Property were not kept intact based on the approved special permit – notably the removal of the chimneys and the modification of the roof to accept a dormer addition. Furthermore, one cannot keep intact materials that are structurally deficient due to deterioration. Strange, Caridi and Danielson were among the defendants who caused harm to the Property with their reckless indifference and failure to follow due process; effectively subjecting the property to harm, injury, decay, dissolution and decomposition. It took the Town of Easton four weeks to grant permission for the Plaintiff and Castillo to mobilize to protect the structure after the violation was issued. Furthermore, it is common knowledge, among industry professionals and laypersons alike, that rotten wood must be replaced when discovered. Even the best carpenter cannot effectively fasten a rotten piece of wood to a structurally sound piece of wood. The replacement of rotten wood is not a topic of debate, discussion or remedy for the Planning Board in any way.

v. As Noted in EXHBIT C, both the meeting minutes and the video of the meeting have been removed from the public archives at the date of this COMPLAINT. See Screenshots of public databases in EXHIBIT C.

11. On or about September 28, 2022, phone conversations between Danielson and The Plaintiff were documented in an email whereby Danielson accused the Plaintiff of removing a second story off of a one-story structure and citing this as valid reason for the violation and ensuing remedy process. Presumably, at this point Strange and Danielson recognized their error regarding removing rotten members and decided to pivot to a new complaint rather than drop the matter and find common ground. The Plaintiff pointed out, yet again, that the intent of 780 CMR section R114 was to stop the unlawful activity only and provide an immediate remediation measure to lift the Stop Work Order. The Plaintiff also provided proof that the structure was a one-story structure by including photos as well as a printout of the Town of Easton Assessors Property Card that classified the structure as a one-story cape with a finished attic. Danielson held fast to her interpretation and enforcement of the code and conditions and refused to acknowledge the validity of the documentation. Danielson ended the

discussion stating that 'I live in a cape and where do you think I go when I go upstairs?" (See exhibit G).

    i. Danielson demonstrated deliberate Indifference and a failure to act on information and deprived the Plaintiff of her Constitutional rights of the United States.

    ii. The email chain of EXHIBIT G also marks the approximate timeframe for when Castillo was given verbal permission from Caridi to remobilize to protect the structure. No Defendant called the Plaintiff to inform her of the updated directive to do protection only work on site or what that could consist of. Based on the existing roof framing having been removed, it would be near impossible to install any type of protection that could both hold back and withstand the weather without constructing a structure to hold said tarps onto the structure and onto the ground. The Plaintiff and Castillo agreed that anything simple to install would end up in a neighbor's yard or blown into the street - potentially injuring people and/or property. Additionally, the water damage was already significant due to the roughly four weeks that had transpired since the Order to immediately demobilize was issued, and massive rainstorms from a busy hurricane season in the south were bombarding New England that year. In short, you would have to build a structure for the tarps to be properly secured to and that would require both new framing, as well as removal of the remaining demo debris that remained onsite, to safely work in any capacity. In the Plaintiffs experience, mold begins to grow in 48-72 hours and covering it often creates an environment that allows mold to proliferate.

12. On October 4, 2022, The Plaintiff had a ZOOM meeting ("Zoom") with Danielson and Strange. Strange started the call with threatening remarks indicating that if "(The Plaintiff) didn't admit wrongdoing then this conversation is finished" Strange later offered The Plaintiff the "remedy" of tearing the rest of the house down, thus 'preserving' none of the structure in any capacity, rebuild the new Structure to exact historic dimensions and details including requiring the use of wood clapboard siding,[1] and pay a fine of Five Thousand ($5,000.00) Dollars to the Historic Commission. In this call, Strange indicated that if these terms were not agreeable, then whatever was proposed in the future on the site would need Planning Board approval and he didn't have to approve anything for the property. Strange ended his statement with "not that I'm threatening you" and later repeated the statement for emphasis. This Zoom meeting was recorded at The Plaintiff's request and the recording was distributed to the Plaintiff about a month later by Danielson. Throughout this Zoom, Strange dominates the conversation talking about all of the homes that he has designed and built and is condescending to my Client and refuses to allow her to speak. He informs the Plaintiff that he "feels like he has been lied to" and makes further inflammatory and defamatory statements throughout the call. After The Plaintiff leaves the call, Strange and Danielson continue speaking, while still being recorded. They were having a personal conversation and joking about the situation The Plaintiff has found herself in. (see EXHIBIT H) These behaviors were a deprivation of the Plaintiff's Constitutional Rights of the United States.

---

   i. Strange indicated that he was attending the meeting as the Chair of the Planning Board and not a member of the Commission. Neither position has the authority to assign a fine. There is no legal precedent in law for fines this excessive. Strange and Danielson deprived the Plaintiff of her Constitutional Rights of the United States with the insistence of the unlawful meeting, with their conduct in the meeting, and with the demands made in the meeting.

   ii. All the Demands/Remedies made by Strange and Danielson are demands that exceed those that fall under the Commission's zone of influence and neither party was empowered to make such demands on behalf of the Commission in any capacity. Included in the Design Guidelines issued by the Historic Commission is a paragraph on a fine of $300 if the property owner fails to submit the design intent to the Commission before work commences. The Plaintiff submitted the design to The Planning Board, who copied the Commission to solicit feedback, and to the Department of Inspectional Services as part of the Building Permit application. These demands were a flagrant and negligent misrepresentation and deprived the Plaintiff of her Constitutional Right of the United States

   iii. Strange agreed that the Structure was not sound and should be razed, but he has no authority as the Chair of the Planning Board to approve this action by himself. It was a fraudulent and negligent misrepresentation for Strange to attest that all the demands he made were approved by all stakeholders In the Town of Easton, when to do so would require multiple parties at best. Strange and Danielson deprived the Plaintiff of her Constitutional Rights of the United States.

   iv. Strange wanted clapboard siding on the new structure. This was material that Strange attempted to get incorporated into the project during both the Commission Meeting and the Planning Board Meetings. No other member of either Board supported his stance and the Historical Commission Standards for homes that the Commission does have authority over does not even insist on this material being used exclusively. This excessive punishment deprived the Plaintiff of her Constitutional Rights.

13. On December 6th, Attorney's Hayes and Deschenes, then representatives of the Plaintiff, placed a call to Kevin Greiner, Inspector of Buildings/Zoning Enforcement Officer ("Greiner"). During this conversation, Deschenes attempted to discuss a path of resolution which would include adhering to the zoning violation process (See EXHIBIT D). Greiner had not spoken to Danielson, but stated he would speak to her. Grenier stated that he had to defer to her for any input and that in order to lift the order, he needed to hear from the Planning Board that they were satisfied with the resolution. It was after this conversation with Greiner that Danielson called the Attorneys' office to speak with Hayes or Deschenes. Her response was nothing less than combative and there was no meaningful dialogue. Danielson again stated that she already told the Plaintiff what needed to be done and remained steadfast stating that the only way The Plaintiff could lift the Order was agree to the ill-conceived and completely unlawful proposition now maintained by Strange and Danielson based on the 10/4/2022 Zoom and now clearly supported by Greiner. Strange, Danielson and Greiner deprived the Plaintiff of her Constitutional Rights of the United States.

   i. The Defendants all keep changing the path to resolution. The Remedy quickly became a hot potato in a childlike game of keep away where it was

difficult for the Plaintiff to determine who has the authority and what newly invented process should be used to arrive at a resolution. There was no attempt to follow the resolution process set forth in state and local law, this was a deprivation of the Plaintiffs constitutional rights of the United States.

ii. Caridi tried to attest that 'Seeing the Planning Board" was the Abatement/Remedy order. Then Greiner stated he needed input from Danielson who is not a member of the Planning Board. Neither Caridi nor Greiner will take any responsibility for their roles in creating this overblown situation; nor will either of them assert their actual roles or authorities to assist in finding a remedy. These actions deprived the Plaintiff of her Constitutional Rights.

14. Also, on December 6th, Hayes emailed a request to Greiner and Danielson to be added to the next Planning Board meeting agenda on December 19th so that Danielson's requirement would be satisfied of Planning Board action. When Hayes did not receive a response to that email, She followed up on December 12th, Danielson responded stating "I have not been able to confirm the 19th ." Hayes then emailed again on December 15th to get a status and received a response from Danielson asking if The Plaintiff was going to move forward with "the resolution discussed during the meeting with Ms. Kingston, Mr. Strange, and me on October 4?". Danielson refused to add the Plaintiff to the Planning Board Agenda without confirmation of acceptance of the excessive and unlawful demands dictated on the Zoom call. These actions were a deprivation of the Plaintiffs Constitutional Rights of the United States. If the Remedy was to "See the Planning Board" then depriving the Plaintiff of seeing the Planning Board is a deliberate attempt to make good on threats made in the Zoom call and is a clear deprivation of the Plaintiffs Constitutional rights of the United States.

15. On or About January 6, 2023 a letter was sent from Hayes to Connor Read ("Read") the Town Administrator for the Town of Easton. identifying a full history of events starting with the January 4,2022 Historic Commission Meeting. (See EXHIBIT A incorporated fully.)

16. On January 19,2023 the Town of Easton's Counsel Jason Talerman ("Talerman") sent an email to Hayes and Deschenes acknowledging receipt of the letter dated January 6th and a positive response of working together to get the project back on track.

17. On February 14,2023 an unrecorded zoom meeting took place with Hayes, Deschenes, Talerman, and Read. The Plaintiff was permitted to listen but not participate. This meeting was not in the spirit of working together as proffered by Talerman in his January email. Allegations were made against the Plaintiff that the roof re-framing was an attempt by the Plaintiff to demolish the building and bypass the demo delay law. Read with Talerman provided zero evidence of this allegation, instead relying on a demo permit filed in November of 2021 as proof of intent. The demo permit in question was filed for by Castillo to remove interior finishes, which is clearly stated on the permit (See EXHIBIT B). This work was necessary to ascertain if the chimneys were structurally in good order and could be reasonably salvaged. Prior to the Plaintiff purchasing the property, it could be witnessed from the street that one chimney had already been rebuilt above the roofline and the other chimney was precariously leaning over (See EXHIBIT I). In buildings of this time period, the stone chimney work extends from the basement through the roof as a free-standing structure and is often in disrepair as many components are hidden behind walls and are typically not maintained. The Plaintiff, in her experience, was skeptical that the

chimneys could be saved and wanted to include those findings in the Special Permit process, so she asked Castillo to file for a demo permit and expose the chimneys and structural framing as an exploratory phase of work. The Permit was approved on November 24, 2021 by Caridi. During the Special Permit process, the Plaintiff provided a report Kozhokin prepared regarding the structural integrity of the chimneys (See EXHIBIT I). The Report, dated January 10, 2022, included photos of both the now exposed framing as well as the now exposed masonry chimneys. The report included written findings by Kozhokin that the uncovered structural deficiency was beyond reasonable and practical repair. The request to salvage the chimneys was removed from consideration at the January 10,2022 Planning Board meeting based solely on Kozhokin's report that salvaging the chimneys was not a practical ask for economic housing. Surely if the intent was to raze the structure from the outset, the Plaintiff would have pivoted the entire project at the time chimney report was issued. Read with Talerman held fast to their belief that the Plaintiff intended to deceitfully raze the structure from the outset and yet provided no evidence to support this allegation. Read with Talerman then compelled the Plaintiff to keep the remaining structure intact despite the recommendations from both Strange and the Plaintiff to the contrary. It was truly the only point Strange and the Plaintiff ever agreed upon – which should have been noteworthy to any experienced supervisor, but Read held fast to his position. The Plaintiff was ultimately burdened with the task of getting 'experts' to document the need to raze the structure. This was an unsettling request for the Plaintiff as she was often hired as an expert in construction during her 30+ year career in the industry and the Town of Easton was not willing to consider her opinion in any capacity. Read with Talerman provided no expert opinions of their own from within the Town of Easton, nor from any independent external experts, whose opinions may be more impartial. It seemed ludicrous that the added task of having the Plaintiff provide paid expert opinions - that the Town may potentially later claim were not impartial; was an ill-conceived set of tasks established only to add the financial burden of money and time onto the Plaintiff in yet another power grab from a named Defendant. Read with Talerman avoided discussing the path forward after this new needless task was completed, as if going out of their way to avoid the topic by creating chaos in baseless accusations, so as to avoid discussing the actions of all the bad actors that were brought to their attention in the Letter issued by Hayes (see EXHBIT A). Hayes and Deschenes again offered that Strange and Danielson agreed the Structure should be razed as part of their demands made on 10-04-22. Read with Talerman held fast that the Plaintiff needed to provide proof that the Structure was beyond repair and suggested that the Plaintiff herself was responsible for damage from not protecting the structure. This was a deprivation of the Plaintiffs Constitutional Rights of the United States and a clear and deliberate move in support of threats made against the Plaintiff on October 4, 2002. Read, being fully aware of the recorded threat, seemed supportive of its intent and not very supportive of finding a path forward.

      i. The Abatement/Remedy has now been passed like a hot potato from Caridi, to the Planning Board, to Danielson, and now to Read. Greiner refused to be passed any responsibility for influencing the remedy or recommending a remedy. At no time did any of the named defendants seek to provide a written comprehensive plan, again making the path to remedy impossible for the Plaintiff and a deprivation of her Constitutional Rights of the United States.

ii. The request to have the Plaintiff provide documentation to prove the structure needed to be razed was clearly at attempt to deliberately delay the Plaintiff and deprive her of her Constitutional Rights of the United States. The need to raze the structure was stipulated to by both sides by individuals with experience in the industry. This demand burdened the Plaintiff with excessive punishment of time and money and was a clear indication that Read approved of the behavior of all of this staff's attempt to delay and threaten the Plaintiff by depriving her of her Constitutional Rights of the United States.

18. On or About April 4,2023 The Plaintiff provided letters to Deschenes from multiple consultants to attest to the deteriorated condition of the structure and subsequent recommendation to have the property razed (See EXHIBIT J). In addition to Kozhokin providing documentation, the Plaintiff provided a letter from Chris Demers, Director of Mitigation Services for Air Care Environmental ("Demers"). Demers notes in his letter that microbial growth at the property was observed. Demers further suggests that the cost of remediation would exceed the value of the structure itself. In the letter Demers also educated the reader of the letter that the use of tarps would have created a more vibrant set of conditions for mold/microbial growth to proliferate. Mold begins to grow in 48-72 hours of water infiltration.

19. On May 23,2023 Plaintiff received an email from Deschenes stating that Talerman had been unresponsive to multiple calls and emails and had yet to commit to time to discuss the path forward.

20. On or about May 27, 2023 Deschenes sent a letter to Talerman, demanding that the Town of Easton and Read provide a path forward to lift the stop work order. Deschenes expressed concerns that threats made by Strange during the Zoom would be carried out and that the Plaintiff would be blocked from all future attempts to develop the Property. Read and Danielson were copied on this letter (See EXHIBIT L).

21. On or about August 21,2023 Talerman issued an email to Deschenes with Read and Danielson copied (See EXHIBIT M). In the email, Talerman cites three items to the path forward 1) "The Town Hall staff acknowledges that, because the structure was not secured after the stop work was issued, it is not salvageable and the Building Comm'r (Greiner) could issue a demolition order, and it would *not* (*emphasis added*) go to Historical. (Commission)". 2)" If your client (the Plaintiff) were to proceed with the plan as approved by the Planning Board, it could be as simple as *a 'mea culpa'* provided that your client (the Plaintiff) reconstruct consistent with the plan approved by the Planning Board." 3) "Enlargement of the structure itself would require a modification of the Special Permit along with other possible relief depending on the nature of the enlargement structure."

    i. Although this email was not a formal letter and doesn't tie back to the violation/stop work order in any formal capacity, it was the only time any of the Defendants put anything in writing. Since Read and Danielson are both copied, it is a reasonable assumption that they were both aware of, and in agreement with, the remedy presented.

    ii. The second item in Talerman's email states that the Plaintiff must subject herself to personal humiliation by publicly accepting fault for the unfortunate series of events that unfolded beginning with the unlawful issuance of the stop work order on or about 08-30-2022. This email does not clearly state exactly what fault must be publicly admitted to in order for the

Stop Work Order to be lifted.  Based on this Statement, Read and Danielson appear to support Strange's behavior of not allowing the Plaintiff to speak or move forward in any capacity without an apology for activities unknown. On at least two occasions, the Plaintiff has accepted fault and offered an apology for not following the process that the Defendants would have preferred for handling latent conditions on site.  The Plaintiff has not apologized for filing for a Building Permit that included structural drawings showing the roof needed complete re-framing and then proceeding with that work upon receipt of a Building Permit from Caridi.  The Plaintiff's apology has not been accepted or acknowledged by any of the Defendants to date, and the Defendants all persist in working together in a coordinated effort to ensure the Plaintiff does not ever develop the Property.  However, when you look closer, this request is in clear contrast to items 1 & 3 in the same email.

   iii.   Item 1 acknowledges that the Town Hall staff were at fault for not allowing the structure to be protected at the time of violation which resulted in the need for the existing structure to be demolished.

   iv.   Item 3 states that the special permit would not need to be modified if the Plaintiff built exactly what was approved in the Special Permit. Well, that is of course exactly what the Plaintiff was doing at the time the stop work order was issued.  Even with the replacement of the rotted members – the Property at the end would have looked like the drawings submitted for permit.  In this case, Talerman of course means that the new structure that would be built in lieu of renovation of existing- as he already stipulated to the fact the existing structure must be torn down.  This is concerning as the Plaintiff was renovating the existing structure, per the approved plans, when the stop work order was issued, and now Talerman advises that if the Plaintiff builds a new structure to match those plans no modification of the special permit would be required. Which means the Town has acknowledged that the violation was unlawfully issued at the outset.  Every subsequent action against the Plaintiff was an artfully coordinated conspiracy to deceit, defraud and conceal the real nature of the true events and force the Plaintiff to accept defamation of character through consistent use of slander, libel, bullying, personal humiliation and excessive financial losses as a side effect of doing business with an unscrupulous group of people as listed as named Defendants on this case.  Theses actions deprived the Plaintiff of her Constitutional Rights of the United States.

   v.   Item 3 in the email also states that if the new structure were to be any larger than all that would be needed was a modification of the existing special permit, unless the modifications required other approvals not known at this time.

22. On or About August 23,2023 Deschenes sent an email to Read, Talerman and Danielson to schedule a meeting to discuss the potential of putting a four-plex on the property as a means of accommodating the Plaintiff for losses caused by various named defendants and acknowledged in Item 21 above.

23. On September 19,2023 The Plaintiff met in person with Talerman, Danielson and Deschenes to discuss options for the Plaintiff to modify the development of the property in such a way that would help to offset the losses unnecessarily incurred. The meeting started with Talerman introducing Danielson as the point person moving

forward.  Talerman sang Danielson's praises offering her as a fair and effective staff member to work with. The meeting ended with an agreement that a new duplex would be built with larger square footage than the original project as long as the value of each unit remained under $950,000 as that was the upper limit of what is considered economic housing in the Town of Easton.  Economic Housing was a provision of the Special Permit. Danielson went on to remind the Plaintiff, with a smirk on her face, that the Plaintiff would still need to appear before the Planning Board to formally approve the modification of the special permit and 'mea _culpa'_ in the public forum was still expected. This request was a deprivation of the Plaintiffs Constitutional Rights of the United States

  i.  This marks the third request for public humiliation by the various bad actors of the Town of Easton.
  ii.  The decision to re-instate Danielson as the authority in charge of the violation/remedy seemed ill advised given Danielson's past involvement in threats to the Plaintiff during the Zoom.  Danielson's actions would have resulted in immediate termination in the private sector. Danielson's limited understanding of construction followed by immature handling of herself when facts were presented in a clear and professional manner, should have immediately omitted her as a point person unless it was done so under meticulous supervision.  Read was fully aware of evidence against Danielson as much of it was laid out in the letter that invited Read into the discussion. (See EXHIBIT A). Read exhibited poor leadership in recommending Danielson be the point person moving forward.  Afterall, one of the main reasons Read was contacted by the Plaintiff, was due to the poor behavior of both Danielson and Strange. Danielson  consistently exhibited poor leadership in her prior attempts at navigating the dispute to final resolution.  Instead, Danielson demonstrated personal enjoyment at the situation the Plaintiff found herself in during the Zoom recording and demonstrated a similar mindset with the smirk in this meeting.  Any decision to allow her to serve as a point person, can only be interpreted as both an endorsement of her behavior by Read and a clear threatening message to the Plaintiff.  This was a deprivation of the Plaintiff's Constitutional Rights of the United States.

24. On or about February 20,2024 Castillo, on behalf of the Plaintiff, filed a demolition permit to raze the existing structure at the Property as per the agreement set forth in writing by Talerman on 08-21-2023, and discussed in person with Talerman and Danielson on 09-19-2023.  Among the documents uploaded for approval was a copy of the email from Talerman (See Exhibit M) in the odd chance that Caridi and Greiner were not in the loop.
25. On March 4, 2024, Castillo received a rejection of the demolition permit on the basis that the Property resides in the Historic District and as such, the Commission would need to approve the application. (See EXHIBIT O).
  i.  It now appears that Greiner is the authority/point person over the violation/remedy and is not in agreement with what Read and Danielson with Talerman presented in August 2023.  The email documentation from Talerman was included in the permit application in the event that, Read and Danielson neglected to inform the affected parties of the agreement. Greiner displayed deliberate indifference when Castillo attempted to

      discuss the remedy agreement email with him. This was a deprivation the Plaintiffs Constitutional Rights of the United States.

    ii. It now appears that Greiner is aligned with Strange and Danielson's threat on 10-04-2022 and has positioned himself to follow through on the threats to make sure the Plaintiff cannot develop the Property. Greiner indicated in the past that as long as Danielson was satisfied, he (Greiner) would lift the stop work order. By newly creating an obstacle that Read and Danielson removed – Greiner is essentially sending the message that the concealed coordinated conspiracy was still going strong with the named Defendants. Greiner deprived the Plaintiff of her Constitutional Rights of the United States.

    iii. Further noteworthy is that the local Commission has gone on record multiple times and in multiple documents/video's that the Commission has no authority over the property and can only ask for historic considerations as the Property is not in the Historic District, nor on the Historic Register.

    iv. The Plaintiff agreed to all of the Commission's asks during the Special Permit process with the exception of the Chimneys (See item 17 for discussion on the chimneys).

26. On or About April 11,2024 Gregory Fleming ("Fleming") of Mirrione, Shaughnessy Uitti, LLC, submitted an application for modification of the Plaintiffs' Special Permit, including a letter in support of the application. (See EXHIBIT N)

27. On April 23,2024 the Plaintiff received a phone call from Walter Mirrione ("Mirrione") regarding the special permit application. The Plaintiff was informed that Danielson called to say that the Application was rejected. Danielson advised Mirrione that multiple other permits have been determined to be needed before an application to modify the Special Permit can be accepted or considered. Danielson identified the Commission's approval on the demolition permit as the next step. This was yet again an attempt to not allow the Plaintiff to be heard at the Planning Board and a display of deliberate indifference on Danielson's part as this new request was not at all what was discussed as the violation remedy moving forward. This was a deprivation of the Plaintiffs Constitutional Rights of the United States and a clear indication of the coordinated effort to make good on threats issued on 10-04-2022.

28. On or about April 30,2024 The Plaintiff discussed, with Mirrione, the option of the Town purchasing the Property for the value of the Property plus sunk costs for the last two years of deliberate delays and deprivation of Constitutional Rights of the United States.

29. On May 1,2024 Danielson emailed Mirrione to advise that there was Provisional Interest in making the Property a Habitat for Humanity site. (See EXHIBIT Q)

30. On June 27,2024 The Plaintiff spoke, via phone, with Dottie Fulginiti ("Fulginiti") the Chair of the Select Board for the Town of Easton. The Plaintiff recounted a few key dates and actions around the theme of the absent and elusive abatement order and poor handling to date by various named defendants (see Exhibit P). The Plaintiff also advised Fulginiti that the solution to have the Town buy the Property for sunk costs and use it for Habitat is truly a win-win-win solution for all parties.

31. On July 9, 2024 Beitler emailed an offer to purchase the Property to Mirrione for review by the Plaintiff. The value was allegedly based on an independent appraisal that was not provided to the Plaintiff and did not appear to include any provision for sunk costs as requested by the Plaintiff.

32. On July 15 ,2024 The Plaintiff spoke to Fulginiti who offered no constructive assistance. Fulginiti immediately started a game of HE SAID/SHE SAID and began to fling allegations and would not allow space for a meaningful response. It was clear Fulginiti did not review the documentation or perhaps Fulginiti felt justified in defending unlawful acts. The conversation ended quickly with The Plaintiff saying that in spite of the various threats made to her by various Defendants, The Plaintiff did not want to threaten the Town. Fulginiti insisted that Business is Business and that the Plaintiff should proceed as such. Fulginiti's deliberate indifference and failure to act on information was a deprivation of the Plaintiffs Constitutional Rights of the United States.

33. Also, on July 15,2024 The Plaintiff sent Mirrione a list of questions and documents needed in order to provide a thorough and well thought out counter offer. The Plaintiff requested a time extension for obtaining and reviewing the Appraisal, and the abatement order. Mirrione later advised The Plaintiff that the response from Beitler was an empathic NO to any time extension and there would also not be a consideration to any price above the value in the offer. (See EXHIBIT R)

34. On July 22,2024 Danielson responded to Mirrione's 07/15/2024 request, on behalf of the Plaintiff, for documents. Danielson noted that "My department's copy of the stop work order did not include an abatement order, so I checked with the Building Department and was informed there was no abatement order included with the stop work order". (SEE EXHIBIT S)

    i. So now, almost two years later the Town of Easton Inspectional Services/Building Department has openly agreed that no Abatement Order was issued. Caridi lied two years ago when he said that "seeing the Planning Board" was the Abatement order. Caridi acknowledged that he issued an unlawful order. This was a deprivation of the Plaintiffs Constitutional Rights of the United States.

    ii. Additionally noteworthy is that for some reason Danielson seems blissfully unaware that an abatement order was negotiated with Read, Danielson and Talerman on August 21,2023 and every response from the Town following the August 21,2023 agreement - was an escalation of threatening behavior of behalf of all the named defendants. This was a deprivation of the Plaintiffs Constitutional Rights of the United States.

35. On or About August 2, 2024 Strange responded to a Facebook post made by Troy Coleman, who expressed curiosity about the Property and why the work has been stopped for two years. Strange engages in Fraudulant and Negligent misrepresentations of facts during his lengthy editorialization. (See EXHIBIT T). This was a deprivation of the Plaintiff's Constitutional Rights of the United States.

## EXHIBITS

36. EXHIBIT A – Letter to Town of Easton Dated Jan 2023 sent to Connor Read with Attachments noted in letter included.

37. EXHIBIT B – Full Set of Drawings submitted and approved for Building Permit

38. EXHIBIT C - Planning Board Meeting 2022-09-07
39. EXHIBIT D Building and Zoning regulations for alleged violations
40. EXHIBIT E Historic Commission Meeting 01-04-2022
41. EXHIBIT F Existing Framing removal and photo
42. EXHIBIT G Email with Danielson dated 09-28-2022 and Property Card from Assessor
43. EXHIBIT H Recorded Zoom with Danielson, Strange and Plaintiff
44. EXHIBIT I Chimney assessment by Berdi dated 12-04-2021 and Photos
45. EXHIBIT J . Berdi, Castillo and Air Care Letters in support of razing structure
46. EXHIBIT K -Not Used
47. EXHIBIT L Letter from Deschenes to Read dated May 25, 2023
48. EXHIBIT M Email from Talerman confirming path forward dated 08-21-2023
49. EXHIBIT N Memo is support of Application to Modify Special permit dated April 5, 2024.
50. EXHIBIT O Rejection of Permit to Raze the Structure dated March 4, 2024
51. EXHIBIT P Text Message chain between Fulginiti and the Plaintiff dated June 27,2024
52. EXHIBIT Q Email from Danielson expressing provisional interest in purchasing the property dated May 1, 2024
53. EXHIBIT R Email between Mirrione and Plaintiff commenting on a phone call with Fulginiti and a request for documents needed to complete a counter offer dated July 15, 2024
54. EXHIBIT S Email from Danielson stating that an abatement order had never been issued for the Violation dated July 22, 2024.
55. EXHIBIT T Facebook posts from Strange on or About August 2, 2024


**First Claim**

42 U.S.C §1983 – Against All Defendants


56. Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.
57. Defendants at all times relevant to this action were acting under the color of state law.
58. Defendants Greg Strange, Fank Caridi, Kevin Greiner, Stephanie Danielson, Connor Read, Dottie Fulginiti,  The Town of Easton Inspectional Services, The Town of Easton Planning and Zoning Board, The Town of Easton Dept of Planning and Economic Development, The Town of Easton Dept of Town Administrator, the Town of Easton Select Board, and the Town of Easton unlawfully deprived Plaintiff of her life, liberty and property without due process of law in violation of the Fourteenth Amendment Section One to the Constitution of the United States of America.
59. Defendants Greg Strange, Fank Caridi, Kevin Greiner, Stephanie Danielson, Connor Read, Dottie Fulginiti, The Town of Easton Inspectional Services, The Town of Easton Planning and Zoning Board, The Town of Easton Dept of Planning and Economic Development, The Town of Easton Dept of Town Administrator, the Town of Easton Select Board and the Town of Easton unlawfully deprived Plaintiff of her life, liberty and property without equal protection of law in violation of the Fourteenth Amendment Section One to the Constitution of the United States of America

60. Defendants Greg Strange, Frank Caridi, Stephanie Danielson, Kevin Greiner, The Town of Easton Inspectional Services, The Town of Easton Planning and Zoning Board, The Town of Easton Dept of Planning and Economic Development, The Town of Easton Planning and Zoning Board and the Town of Easton unlawfully deprived the Plaintiff of her property through, Unreasonable Intrusion, Interference with possessory Interests and unreasonable restraint in violation of the Fourth Amendment of the Constitution of the United States.

61. Defendants Greg Strange, Frank Caridi, Stephanie Danielson, Kevin Greiner, Connor Read, Dottie Fulginiti, The Town of Easton,  The Town of Easton Inspectional Services, The Town of Easton Planning and Zoning Board, The Town of Easton Dept of Planning and Economic Development, The Town of Easton Dept of Town Administrator, and the Town of Easton Select Board unlawfully deprived the Plaintiff of her life, liberty and property through cruel and unusual punishment, and unusual and unprecedented fines, in violation of the Eighth Amendment of the Constitution of the United States.

62. Defendants Greg Strange, and Stephanie Danielson, The Town of Easton,  The Town of Easton Inspectional Services, The Town of Easton Planning and Zoning Board, The Town of Easton Dept of Planning and Economic Development, The Town of Easton Dept of Town Administrator, and the Town of Easton Select Board unlawfully deprived the Plaintiff of her property by refusing to allow her to attend and/or speak at public and private meetings, refused to allow Plaintiff to appear before the Planning Board, Refused to allow Plaintiffs Modification of Special Permit to be considered all in violation of the First Amendment of the Constitution of the United States.

63. Defendants Connor Read, Dottie Fulginiti, Kevin Greiner, Peter Deschenes, Christoper Anderson, Robert Stetson, Amos Keddem, Deborah Balcarek, The Town of Easton Inspectional Services, The Town of Easton, The Town of Easton Massachusetts Select Board, and The Town of Easton Massachusetts Dept of Town Administrator, The Town of Easton Inspectional Services, *Failed to act and/or Intervene* when the Plaintiff, and/or Plaintiff's representative notified them of rights being violated.

64. Defendants Frank Caridi, Greg Strange, Peter Deschenes, Robert Stetson, Amos Keddem, Deborah Balcarek, Christoper Anderson, Stephanie Danielson, Connor Read, Dottie Fulginiti, Kevin Greiner, The Town of Easton Inspectional Services, The Town of Easton, The Town of Easton Massachusetts Select Board, and The Town of Easton Massachusetts Dept of Town Administrator, The Town of Easton Building Department, *Deliberate Indifference* when the Plaintiff attempted to assert her rights.

### Relief/ Demands/Damages

Plaintiff Claims Compensatory Damages:
a.    Land Value    $302,000.00
b.    (2) Townhouses        $1,850,000.00
c.    Construction Costs, Holding Costs, Finance Charges and other sunk costs associated with the Property including damage      $795,000.00
Defendants caused direct and actual losses with their actions of the above costs.


Plaintiff Claims Punitive Damages:

    d.   Intentional Emotional Distress  $1,500,000.00
    e.   Mental Anguish  $1,500,000.00
    f.   Lost Earnings, Lost Earning Capacity & Loss of Future Earnings  $800,000.00
    g.   Defamation/Slander/Libel    $1,000,000.00
    h.   Fraudulant & Negligent Misrepresentations    $1,000,000.00
The Defendants actions affected the Plaintiff's ability to earn an income by tying up personal monies and credit; resulting in preventing the Plaintiff from engaging in any other real estate endeavors until this was resolved and all debts satisfied.

i. An award of costs and expenses against the Defendants
j. A Jury Trial on all appropriate issues
k. Any and all other relief this Court May deem appropriate

Respectfully submitted,

Aimée Kingston

Pro Sé